that was almost a tort I remember that from law school a civil wrong not found it in contract I remember that from the bar breaking. Okay, Mr. Corcoran. Mr. Harrington. Oh, Mr. Harrington, I'm sorry. I've got got them out of order. Thank you. You're going to, you're not reserving any time at all. Correct. Okay. You can proceed. Well, may it please the court. The key question presented by Mr. Smith's petition is, is whether the merit systems protection board aired when it found that GSA produced clear and convincing evidence that it would have removed Mr. Smith absent is protected activity under the whistleblower protection act. The board did find that he made at least one protected disclosure under the WPA and that that protected disclosure was a contributing factor to his removal in the in the blue brief at 15. You argue that Mr. Smith's PIP quote did not establish any specific goals or deliverables, but the improvement plan discusses things like completing certain training courses and raising his communication skills. Are those not specific sufficiently specific? I think your honor he wasn't required to take specific courses. I think there was a general recommendation that he take some training. There was no specific requirement. And in terms of improving his communication, there was no measurable goal by which that could be determined. I mean, I think we referenced that as an example of kind of the underlying animus that was going on at that time. But in terms of the board's finding that GSA had produced clear and convincing evidence, we argue that the board aired because it did not analyze, discuss or consider Mr. Smith's countervailing evidence. Can I just ask you if I guess I think of your argument in the following way. If you look at what amounts to the single paragraph amounting to of which two sentences address this question, the first is just a conclusory assertion that the agency would have taken this action even had there been no protected disclosure. And then the next sentence says, indeed, I find that the defiantly disrespectful misconduct described in charge one alone would have justified his removal. I take it that part of your point here is that going from that first sentence to the second sentence actually changes the legal standard. Agencies refrain from taking many actions that they would be justified in taking. And that's not the question under 1221E2. The question is, would the agency have taken this had your client not engaged in the particular December 2015 83 page protected disclosure? And I think maybe you have asserted other protected disclosures as well. And that question is not analyzed at all by the AHA. I agree, your honor, and I think that's the fundamental issue that we've raised here. There's no discussion of any of the first two car factors that the board must discuss. And there has to be an in-depth review and full discussion of those various issues, particularly any motive to retaliate on the part of GSA management officials who are making these decisions. Following on to that question from Judge Toronto, do I correctly understand that if it were possible that you could avoid analysis of the car factors by just looking at whether the charge had been proven and whether there was nexus and whether the Douglas factors were analyzed, then would there never be a whistleblower defense in these kinds of cases? I'm just, I'm trying to figure out and wrap my head around exactly, you know, why it is that these two sentences together show a lack of analysis or the wrong analysis. Well, certainly in a situation such as this for Mr. Smith has raised an affirmative defense under the WPA, those car factors must be must be applied. And the case law is clear on that. And there is it's error on the part of the board to not apply those factors. And again, there was simply no discussion of Mr. Smith's countervailing evidence and weighing the strength of the agency's evidence. No discussion of or analysis of any motive to retaliate on the part of the management officials. If we find that the car factors are missing, do we send it, vacate and remand and send it back for them to redo it or reverse? We have asked that that you reverse and vacate the the initial decision. And how can we do that? Well, certainly the relief we're requesting, if you think that you cannot do that, then certainly we would ask you to be remanded for a full consideration of these car factors and the decision be made without the errors that thus far have tainted it. And back to the car factors, John, I just want to mention quickly the comparator evidence, which is the third car factor. The agency did not produce any comparator evidence. Did you? By comparator, you mean somebody else who was in a similar position, having sent complaints to higher ups outside the agency on matters that would constitute protected disclosures? Did you identify anybody else who was similarly situated in that respect? We did not, Your Honor. So it's I mean, well, what was what was there to address that wasn't addressed on that particular fact? Well, certainly there, again, the case law is clear that the agency bears the risk of there being no comparator evidence. And that absence of comparator evidence can in and of itself be fatal to an analysis of independent causation under the car factors. Can I ask you this question? In December 2014, and then reiterated, I think, May 6, 2015, there came a directive to Mr. Smith that didn't say if you're going to communicate with higher ups, show us what you're going to do, say first, so that we can at least tone it down or change the language or correct things that you may have gotten incorrect. It said, you need our approval. Do you view that as a order contrary to law, in particular, contrary to the Whistleblower Protection Act? Yes, we do. I mean, it's in essence, I mean, it can be read to prevent him from making a protected disclosure without his supervisor prior approval. It would certainly if Mr. Smith wanted to make another protected disclosure outside of his management chain or even within his management chain, that directive required him to get his supervisor's approval before doing that. And I gather some of the theme in your brief is that, I don't know, what one might call annoyance or disapproval of that get approval order, including the you're not the boss of me kind of language that he used may be connected to that. That's correct. And that's really the focus of our kind of argument throughout the brief about the lack of context and the lack of discussion of context in the in the board's decision. And this really also highlights the board's failure to make any findings with regard to whether Mr. Smith made any, any prior protected disclosures. The board found that his December 2015 performance diagnostics report was a protected disclosure. He had alleged and produced testimony at the hearing that he made very numerous similar disclosures in the two or three years leading up to that particular report, the same types of issues that he'd raised. And it was really, he argued that it was those communications that led to the communication restriction initially. Since you're not reserving any time, I want you to talk a little bit about the security violation argument, because I think that's something the government's going to say. I'd like to discuss the context of it. OK. Well, Your Honor, Mr. Smith is quadriplegic. And again, he's a 28 year GSA employee. He produced testimony really undisputed by the management officials that for a number of years he had not removed his card or undocked his laptop when he would leave on a daily basis. Just because, you know, given his disability, he lacked the dexterity to do that. And in that sense, I think Mr. Smith is his own comparator. We didn't make this argument in the brief, but I think it's a fair way to look at this. For a number of years, this was not an issue. He did not have a formal accommodation. I think the board faulted him for not having requested a formal accommodation. But he had an effective accommodation for a number of years, and he testified that the management officials, Ms. Gladman, Mr. Nastassi, knew that he didn't undock his laptop and that he didn't remove his card. And it hadn't been an issue until his protected activity. And then it became an issue, which, if anything, you know, highlights the board's, you know, its error in finding that the GSA had produced the clear and convincing evidence it needed to produce. But it's that same, I don't know if you, the more you want me to stay on that security issue? No, not really. I don't think any real harm was, obviously it's an important policy, and there is an exception for disabled employees under that particular policy. But there's, you know, Mr. Smith had not gone through the formal process to have that policy applied to him. But de facto, he had that accommodation for a number of years prior to his protected activity. Can I ask you about one of the other specifics, which I just, I guess I don't know enough about the underlying details. One of the charges found against him was disobeying an order not to work on weekends. Correct, Your Honor. What kind of, who orders somebody not to work on weekends? Perhaps somebody doesn't want to, would your client have gotten more pay by doing work on the weekends? No. What's the basis for an order, don't work on weekends? As I understand it, and I'm sure agency counsel is more familiar with this than I am, government employees, it's like during the... It's an ADA argument, I assume, Anti-Deficiency Act. Well, as I understand it, government employees are not supposed to work off the clock, period. Even if they want to donate their time, yeah. So it has nothing to do with overtime or accommodations, you think? No. Or a building facility or anything on the weekend. As I understand it, it's just a simple policy, you're not supposed to work off the clock, even if you want to donate your time. But I would just say... Was it a policy that applied to everybody? As I understand it, it did. But here again... I'm sorry, again, context, you know, I was in the Justice Department for a few years and we see, you know, Justice Department work. I bet they're working more than 40 hours a week. It can't be that they are forbidden by statute to work off the clock. Well, I don't want to misstate what the statute says because I think I understand it, but I could be wrong. Maybe the government can... But I think I agree with your broader point, Your Honor, which is that like the PIV card, like the laptop, Mr. Smith said, you know, he had often worked on the weekends in the past. It wasn't that unusual. And here he explained that, you know, he had put together a report. He was waiting for one little piece of information. He got this piece of information over the weekend, typed out a concluding sentence on his report, and sent out the email. But again, this weekend work had not been an issue prior to his protected activity, and it only became an issue when the agency was looking to remove him. And we argue, as the board found, Mr. Smith's protecting activity was certainly a contributing factor to that decision. But back to the communication restriction. The other thing I wanted to highlight in terms of the context of that is management issued this communication restriction to Mr. Smith, said he couldn't communicate without their approval. At the time, he already had grievances related to what we argued were previous protected disclosures. To resolve those pending grievances, GSA issued him a new position description that said he gave him... made him a senior financial advisor, gave him more independence, said that he would act under administrative supervision, and that he could communicate widely throughout the GSA outside of the office of chief financial officer in which he was housed. And it was in the context of his new position description and how Mr. Smith interpreted it and the authority it gave him, that he was having these contentious communications that underlie charges charge one and the five specifications under charge one. And, again, the board did not discuss really the context of those communications in light of communication restrictions, the position description that gave Mr. Smith the broader authority. And, again, that is the context. And the board simply did not discuss it, let alone give it the in-depth review that it was required to do. I see that I have ten seconds left, so unless you have any further questions, I'll leave it at that. Thank you, Your Honor. May it please the Court. The government respectfully requests that you affirm the MSPB's decision... You state that starting in 2010, Mr. Smith's supervisors, colleagues, and other GSA officials with whom he worked recognized that he had challenges with effective and accurate communication and the ability to follow supervisory instruction, and that as a result of his actions, you took steps to monitor his actions, that is, the agency. Isn't it an amazing coincidence that they recognized those challenges when he began whistleblowing? It might or might not be. The record is largely absent of his pre-2012 statements. But I think a function of it was just as he started to advance up and started to take on a more senior role. I mean, this man had advanced through 28 years and had come up from a lower level to a much higher level. Taking on more senior roles, they noticed that his communication just was not up to those higher standards that he required. In the blue brief at 14, Mr. Smith argues that no one at GSA ever reached out to him to attempt to demonstrate that his data or his conclusions in his performance diagnostic reports were incorrect or inaccurate. Were they? There are certainly emails, several emails on the record indicating that I don't understand how he arrived at these figures. They seem to be inaccurate. This does not make sense. It was certainly his supervisors certainly could not follow. There were efforts made actually in many of Mr. Smith's communications to follow through and try to implement his solutions. They couldn't understand it. They couldn't match his figures. It didn't make sense. That certainly is not borne out by the supervisors. And certainly there are emails on the record coming back after Mr. Smith. Just to clarify, those are emails that were sent to Mr. Smith? Yes. Because I saw the record included somewhere. Maybe he wasn't copied and people were saying something about it. But I just wanted to confirm that you're referring to emails that were sent to him. I believe at least some of those emails were sent to Mr. Smith. And certainly they were conveyed to his supervisors. And I believe that those issues were discussed. The accuracy of his communication was certainly discussed in reference to his performance reviews, that one of the issues was with the accuracy of his communication. So we certainly, at the very least, even if not, I believe some of those emails were sent to Mr. Smith. And at the very least, even if they weren't, certainly the accuracy of his communications was a topic in his performance reviews. In the RISBRE, at 29, you say to sustain his removal, GSA must only prove that its IT policy existed and that he failed to follow it. What about his claim of disability and ineffective accommodation, that for the past five years he had been permitted to not remove the card? Well, certainly the failure to follow, he wouldn't have failed to follow policy if he had had that accommodation. The IT policy contained an exception for people with disabilities who were unable. He's a quadriplegic, right? Correct, but he also never sought accommodation. Does the GSA dispute that his supervisors knew for that period of time that he was not removing the card? I am not sure of that, Your Honor, but certainly there's no direct evidence the supervisors condoned. You're sure, you must be sure that it disputes or it doesn't dispute. I certainly do not know if for that entire period of time that the supervisors, whether they knew whether he was removing or not removing his PIF card. So you're conceding his argument then? I'm conceding what I'm saying, Your Honor, is that he certainly never sought exception. And he certainly actually never questioned his supervisors as to whether or not they condoned it. Whether they knew that he challenged with dexterity. They certainly knew that he had challenges with dexterity, and he certainly knew that he would have difficulty. But there's no indication in the record that they knew he would be unable to comply with the PIF card requirement or overtly condoned it. But on the record, does the record say anything about he said, I've been leaving this in the PIF card here and the laptop docked for the last five years. And my supervisors knew. Does he say that? I thought he did say that. He testified to that effect. Right, but did you all have contrary evidence that we had no idea? Or yes, we knew, but? As far as I am aware, there is no specific evidence with regards to the laptop. He did, but he did not actually question the supervisor as whether they, they did not question any of the supervisors as whether they condoned it. None of the supervisors actually indicated that they condoned it and they knew of that in their testimony. But if they waited for five years and did nothing and knew of it, why isn't that de facto approval? Well, certainly what the supervisors who were no longer, the supervisor that chose to discipline him for it did discipline him shortly after he started with working underneath that supervisor. But even if it was, certainly the administrative judge who heard the testimony. That doesn't necessarily cut in your favor, you know. I'm not saying it does, Your Honor, per se, but, but what I'm saying is the, as I apologize, Your Honor, is what I've been informed is that the PIV card issue did not become an issue until it showed up on a GSA IT report after it had been left in his computer for multiple weeks. And that is, as it became an issue raised from an IT security perspective to the supervisors. That's when they started having problems with it. It still doesn't cut in your favor as far as I'm concerned. The record reveals that Mr. Smith's position description changed from program expert to financial management analyst. He says, and that was in response to a grievance, correct? Not quite, Your Honor. Okay. The position description was changed in response to a reorganization of the Office of the Chief Financial Officer. The position description was then publicized throughout GSA in response to the EEOs, in response to settle an EEO grievance about discrimination. So the position description actually came out before that. The position description came out in March, and then it was not, it became part of the EEO settlement in August. So the position description came out in 2015. 2015. Okay.  Regarding the PIP goals, many of them seem difficult to measure, such as establish and nurture professional relationships with customers and coworkers, improve collaboration with team members. How are they supposed to be measured? Well, certainly, he was not actually removed for failing his PIP. He was removed for the misconduct of the deliberate and insubordinate disrespectful conduct to his supervisors. But how were the PIP measured? I've seen certainly what was communicated to Mr. Smith and communicated throughout the record is that communications that were disparaging, disrespectful of other people would not be tolerated. And certainly his statements to Mr. Argosas, his statements and emails criticizing management's knowledge of the programs that they were managing, criticizing. Supervisors say, you don't understand your job. The charges laid out in the specification showed an unwillingness to respond to people in a professional manner. And I think that that would be what they were looking for. I mean, they specifically laid out what level three communication was. And one thing within his position description was one thing was expected was to communicate in a civil and professional manner. And I think that that largely would be what they would be looking for is communication to take a tone that was not disparaging of others, to take a tone that was to be professional in the sense that it was proofread. It was it made sense. It was logical. It was clear. It was in a way that was understandable and not frustrating to the people who were reading it. Car factors. There are three car factors, right? Yes, Your Honor. Are two of them not discussed in the MSPB decision? Two of them are not... Analyzed. Well, the third factor of similarly situated comparators drops out because there is no evidence of any similarly situated comparator. No. So that under Whitmore is allowed to drop out just because there is no comparator to make an analysis of. Does it drop out or does the law say that when the government is unable to provide any evidence, there could be an inference there? No, Your Honor. What the standard is, is that the standard is, is can they prove by clearly convincing the evidence that they would have taken the action absent the protective authority? I understand. I just meant for car factor three. Right. If you don't have... There is some case law that I think suggests that under some circumstances when the government doesn't have any evidence, that it could just be something that's taken into account, that there's no evidence. That's all I'm asking about is car factors. You don't have to produce evidence and independently carry the burden on all three car factors. It's done in the aggregate. You carry the burden overall to meet the questions. The car factors are merely pertinent considerations. And certainly, if there is no evidence of similarly situated comparators, it would... Certainly, the evidence of similarly situated comparators could go to bolster the other car factors, and the lack of evidence of similarly situated comparators could certainly go to undermine the car factors. It's merely just weighed in the aggregate. But in and of itself, the failure to produce a similarly situated comparator is not fatal. Sure, but it's something to discuss. Are any of the car factors analyzed? Well, certainly one is analyzed in great detail is the severity of the agency's evidence and the severity of misconduct. Likewise, the agency's motive to retaliate and the rationale for the agency's decision to remove Mr. Smith is certainly analyzed. It was Mr. Smith testified in great detail about why he believed he was removed. Not analyzed by the AJA. Where is it? Well, it is the AJA... I'm sorry. And even the first factor is just seeing my first 25 pages of discussion, right? In particular, about the charge one. I mean, that's the only... It is permissible to do that, Your Honor, is you do not have to reanalyze. Right, but that's what you mean by is that first factor is... It is permissible to rely back on that without restating everything that you stated in the first part of the decision. Right, and then this paragraph ends with, and therefore I find that the government would have done this anyway. Correct, Your Honor. The paragraph does end, but it does not mean that... You have four or five pages of discussion near the end of your red brief that try to do what surely you think it would have been nice if the AJA did. Well, certainly the AJA could have said, had provided more detail in that portion of decision, and certainly we do allude to that in our brief. And it certainly would have been nice had there been a little bit more detail there, but it does not mean it was not considered. As I said, Mr. Smith testified... Right, but I mean our... We don't stop at simply saying, do we know it was not... Well, it's in the decision, Your Honor. Well, except that there were really two sentences here, and one of them states the conclusion, and then the other changes the standard into something that is legally different. Well, it does not, Your Honor. It does not change the standard. The fact that action would be justified does not mean it would be taken. Right, but he did, the AJA did hear testimony from the deciding official and the proposing official as to their rationale for taking this action, and he credited that testimony, credited their testimony, found them credible in several instances, and noted that there's no indication that they lied, and they made it very clear in their testimony that their reasons for taking this action... The problem is that there's no analysis of that. Instead, there's just a conclusion. The government proved its case. Indeed, I find that, you know, they proved charge one alone, and that would have justified removal. There's no analysis here of the car factors at all. So how do we know that what you're saying is what they concluded? We just don't know. Instead, it seems as if the test applied is incorrect because the car factors were not applied. Instead, what was said was the proof of charge one alone justifies the conduct here. The car factors were certainly analyzed, and he did take... Where, though? He did take testimony of... But where in the opinion are they analyzed? It's implicit, Your Honor, in the opinion, and that is... What's implicit, it seems to me, is that the GSA's position is rather than the squeaky wheel gets the grease, that the squeaky wheel, in this case, gets the ax. No, Your Honor. Mr. Smith had... The GSA explained very clearly, and... He made his superiors look bad by revealing information. No, he did not, actually. His information was about the management of the programs in which he administered, so it was outside of his chain of command. What his supervisors had a problem with, and this is very clearly testified to by the deciding official on page 226, and I will confirm that, is that their problem was not the fact that he was disclosing what he believed to be whistleblowing. He was disclosing it as if it was the official position of his office. Using words like I, using words like we, instead of I, saying that this is the official position of the office, which had never been vetted. It was... These missives were overly wordy. They had intense amount of typos. It was very confusing. But how does that... All of that makes a lot of sense. It also makes a lot of sense that in a hierarchical organization in which ultimately the president has control of everything, that people working for higher ups have to be substantially respectful and civil and polite and substantive and not too ornery and not get in the way of things. You can't run the government any other way. Nevertheless, the question here is on the analysis of the whistleblower claim, whether a series of protected disclosures, only one was found but others were alleged, were such that considering the level of seriousness about which one might have very different views of at least some of the charges that were sustained, whether removal would have taken place, not whether it was justifiable on those charges, whether it would have taken place had he not engaged in these protected disclosures. And part of that seems to me to be that your argument about the miscommunications, the tone, the inaccuracies, I don't see how that justifies the December and May, December 2014 order. You must get approval from us before you make, send communications outside the office. As was explained to Mr. Smith and as the administrative judge credited the testimony of the deciding official, the opposing official, the supervisors explaining that restriction, it was not intended, it was intended at his official communications only. To the extent he was producing documents and reports that intended to present themselves at the official position of the office of the chief financial officer, they had to be approved. They testified credibly, the administrative judge credited it, that it was not about restricting his communication. Do we have the, I guess, the December 2014 email and the May 6th email or something just said, by the way, notwithstanding your new position description, what we ordered back in December still stands. So where is the official statement to him of the you must get approval? Well, the original communication description, the communication restriction is at 1949. 1949. 1949, your honor. And I'm going to turn there. For one moment, please. Thank you. So this is near the third paragraph above the thanks. It is. As a result of these concerns, effective immediately, any communication that you wish to transmit verbally or electronically to managers outside of the OCFO must be approved by me before doing so. She outlines the concerns, explains that it must, that the concern is to ensure that the providing service to our customers meets expectations and management, and your communication doesn't meet that expectation, meaning the expectations that you explained right before, but in terms of accuracy and professionalism. Right, but that, I mean, that, right, but that language does not contain the limitation that you were indicating might have been intended, which is official communications from you speaking for the office. But what you do in your own voice speaking for yourself is outside this. This says any communication. They did. She did. Ms. Gladman, his supervisor, did make it clear that this is a change of focus, purely focused on the tone and nature of this communication. And certainly, as they testified, they did testify that that was what was explained to them. That was how they presented it. How did he understand it? I mean, this is really broad, any communication. I certainly cannot speak to Mr. Smith's understanding. I can speak to what his supervisors testified, that it was understood, it was discussed, and what was conveyed to him. And that administrative judge who heard that testimony did credit their explanation for it, which was that it was, credit their testimony, which was that it was directed solely at his official communications. It was not intended to prohibit him from whistleblowing. He was free to whistleblow, and they actually tried to implement many of the suggestions that he put forward. They just couldn't understand them. They were not intended to prohibit his whistleblowing. They were just intended to ensure that statements that included words like, I and we were represented as the official position of his office, met the standards that we would expect of all employees at an organization. Can I switch topic for a second? Yes, sure. Can you explain what's going on with the don't work on weekends order? As what I have been informed of, as Mr. Harrington noted, this is kind of a policy about ensuring government resources, conservation of government resources, ensuring that people work. Wait, wait, slow down. As far as I understand, it was just a uniform policy against ensuring conservation of government resources and making sure that people weren't performing too much work off the clock. Did it apply to everybody? As far as I am aware. Where's that published? I do not know, Your Honor. I'm sorry. What's wrong with work off the clock? And the answer may be it's illegal or it may be it costs us more money, but why? I certainly cannot speak to the specifics of Mr. Smith's position, but certainly in many cases and under the FLSA, you cannot work off the clock without being paid. You have to be compensated for it. Was he in a position as to which that would be true? I do not know, Your Honor. I believe it was about ensuring that management was aware of what was being performed and ensuring that resources were conserved, but that is absent from the record, and I do not have an answer for you as to the specifics of that part. Am I correct in understanding that the only instance of working on the weekend for which he was reprimanded and charged was just an instance where he says he received a communication and then forwarded it to his supervisors where he explained that there was minimal work? Or were there additional instances in which he was charged with working on weekends? In the record, the only charge is of that one instance, and that's the only one that was documented and discussed in the record. I cannot speak to whether or not there are other instances, but according to the charge itself, it notes that he was repeatedly advised not to work on the weekends, and it might have been the one charge that had come up at that point. Did you have any comparators on that? We did not, Your Honor. So with that, I see I have exceeded my time, and for the reasons set forth in our brief, we respectfully request that you affirm the decision of the SPB. Okay. Thank you. The matter will stand submitted.